# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **GARY WALL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:19CV00260 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **HAROLD CLARKE, DIRECTOR** | ) | JUDGE JAMES P. JONES |
| **OF VDOC, ET AL.,** | ) | |
| | ) | |
| Defendants. | ) | |

*Gary Wall, Pro Se Plaintiff; Richard C. Vorhis, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Defendants.*

The plaintiff, Gary Wall, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983, alleging various violations of his constitutional rights. Twenty-four defendants employed by or associated with the Virginia Department of Corrections (collectively, the VDOC defendants) have filed a Motion for Summary Judgment.[1] After careful review, I conclude that the motion must be granted in part and denied in part. I also conclude that claims against three VDOC defendants must be summarily dismissed as duplicative of claims asserted against the same defendants in another action pending in this district.

---

[1] The only other remaining defendant is Nurse C. Price, who is not represented by the Office of the Attorney General.

## I. Background.

Wall was previously incarcerated at Red Onion State Prison, a maximum-security facility operated by the VDOC.  He initially filed this action under § 1983 in March 2019.[2]  On July 14, 2020, the court granted Wall's Second Motion to Amend.  His verified Second Amended Complaint, executed on May 12, 2020, named thirty VDOC employees as defendants and asserted violations of his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as violations of state law.

The VDOC defendants moved to dismiss certain claims under Federal Rule of Civil Procedure 12(b)(6).  That motion was granted in part and denied in part on November 22, 2021, leaving the following claims against the VDOC defendants: (1) First Amendment retaliation claims against L. Collins, A. Duncan, Lt. J. Kiser, Lt. G. Adams, R. Boyd, Lt. J. Lambert, Sgt. B Meade, Sgt. J. Dickenson, K. Moore, J. Looney, and E. Sowards; (2) a due process claim related to Wall's long-term confinement in segregation against Lt. J. Kiser, A. Gallihar, W. Swiney, A. Duncan, L. Collins, S. Day, C. Gilbert, G. Adams, C. Stanley, J. Lambert, R. Kegley, R. Boyd,

---

[2]  This case was initially assigned to the late District Judge Jackson L. Kiser and was later transferred to District Judge Thomas T. Cullen in September 2020.  The case was reassigned to me on January 10, 2022.

and Jeffrey Kiser;[3] (3) Eighth Amendment claims of excessive force and failure to intervene against J. Dickenson, A. Mullins, B. Begley, L. Collins, and C. Gilbert; (4) an Eighth Amendment claim challenging the conditions of confinement in segregation against Harold Clarke, Jeffrey Kiser, M. Taylor, L. Collins, J. Artrip, and M. Elam; and (5) claims of assault and battery against J. Dickenson, A. Mullins, and B. Begley.

The VDOC defendants have moved for summary judgment on some of the remaining claims. Wall has responded to their motion, making it ripe for disposition.[4] I will discuss the facts relevant to the remaining claims in the discussion section below.

## II. DISCUSSION.

### A. Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury

---

[3] Throughout this opinion, I will refer to Jeffrey Kiser by his full name to distinguish him from Lt. J. Kiser.

[4] Wall filed a Response in Opposition to the Motion for Summary Judgment on January 26, 2022. Thereafter, the case was stayed in order to allow the VDOC defendants additional time to locate documents that they were previously directed to produce in response to a Motion to Compel. After the stay was lifted, Wall filed a Supplemental Response in Opposition to the Motion for Summary Judgment on March 6, 2023.

could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).[5] "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* When ruling on a motion for summary judgment, a district court must view the evidence in the light most favorable to the nonmoving party. *Id.* at 312–13. To avoid summary judgment, the nonmoving party must produce sufficient evidence from which reasonable jury could return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The VDOC defendants have filed affidavits and other documentation in support their motion. Accordingly, to withstand summary judgment, Wall must present sufficient evidence that could carry the burden of proof of his claims at trial. His submissions must "set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his favor. *Id.* at 256. "[I]t is well established that a verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021). Wall has also filed a separate affidavit in response to the Motion for Summary Judgment.

---

[5] I have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

B. Claims under Section 1983.

I will first address Wall's remaining claims under 42 U.S.C. § 1983. Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). Wall seeks to recover monetary relief for alleged violations of his rights under the First Amendment, the Due Process Clause of the Fourteenth Amendment, and the Eighth Amendment.

1. Official-Capacity Claims.

As a preliminary matter, the VDOC defendants correctly note that a plaintiff may not recover damages against state officials sued in their official capacities under § 1983. "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, to the extent Wall seeks to recover damages against the VDOC defendants in their official capacities, I will grant the motion for summary judgment as to such claims.

2. First Amendment Retaliation Claims.

Wall claims that eleven of the VDOC defendants retaliated against him for exercising his First Amendment right to file grievances and lawsuits. The retaliatory actions allegedly included "fabricated disciplinary charges; denial of outside recreation and showers; unfavorable classification; and the extensive, arbitrary,

prolonged continued use of security level-S segregation confinement." 2d Am. Compl. ¶ 111, ECF No. 67.

"Retaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. 1983, even if the act, when taken for different reasons, would have been proper." *Am. Civil Liberties Union v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993). Although retaliation is not specifically referenced in the Constitution, it "is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Id.* As relevant here, prison officials may not retaliate against an inmate for exercising his First Amendment right of access to the courts. *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978). Likewise, "inmates possess a First Amendment right to be free from retaliation for filing a grievance." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545–46 (4th Cir. 2017) (*Booker II*). On the other hand, claims of retaliation against prison officials must be examined with care because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct" or other concerning behaviors. *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996).

To prevail on a retaliation claim under § 1983, a plaintiff must establish three elements: "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there

was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (*Martin I*).  It is well established that the filing of a grievance or a lawsuit is protected conduct that satisfies the first element.  *Booker II*, 855 F.3d at 541; *Hudspeth*, 584 F.2d at 1348.

With respect to the second element, the plaintiff is required to show that a defendant's allegedly retaliatory conduct caused "more than a *de minimis* inconvenience" and that it "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).  "This objective inquiry examines the specific facts of each case, taking into account the actors involved and their relationship." *Booker v. S.C. Dep't of Corr.*, 583 F. App'x 43, 44 (4th Cir. 2014) (unpublished) (*Booker I*).  Although "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity," *Constantine*, 411 F.3d at 500, it "is not dispositive of the question of whether such action would likely deter a person of ordinary firmness," *Martin I*, 858 F.3d at 250.  The Fourth Circuit has recognized that filing a false disciplinary charge against an inmate can satisfy the second element of a retaliation claim.  *Booker I*, 583 F. App'x at 44 (concluding that such conduct "would likely deter prisoners of ordinary firmness from exercising their First Amendment rights").  The court has reached the same decision with respect to placing an inmate in

segregation.    *Martin I*, 858 F.3d at 250 ("Certainly, placing an inmate in administrative segregation could deter a person of ordinary firmness from exercising his First Amendment rights.").

The third element of a retaliation claim requires the plaintiff to show that "there was a causal relationship between his protected activity and the defendant's conduct." *Id*. at 249.  In *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) ("*Martin II*"), the Fourth Circuit held that the same-decision test set forth in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), an employment case, applies to inmates' retaliation claims.  "That test allocates a prima facie burden to the plaintiff to show that his protected activity was 'a substantial or motivating factor' in the defendants' action." *Shaw v. Foreman*, 59 F.4th 121, 130 (4th Cir. 2023).  "The burden then shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same action in the absence of the plaintiff's protected activity.  *Id.*  A plaintiff may meet his prima facie burden by showing "(1) that the defendants were aware of his engaging in protected activity and (2) some degree of temporal proximity to suggest a causal connection." *Id.*  Conclusory assertions that a defendant acted with a retaliatory motive will not suffice. *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994).

a.  Disciplinary Charges.

Several of Wall's retaliation claims are based on what he describes as "fabricated disciplinary charges."  2d Am. Compl. ¶ 111, ECF No. 67.  Wall alleges that he received fabricated charges from Sgt. B. Meade, Officer K. Moore, and Officer J. Looney in retaliation for engaging in protected activity.

i.  Charge Written by Meade.

Wall alleges that, on July 23, 2017, Meade wrote a fabricated charge against him for disobeying a direct order.  Wall alleges that Meade told him that the charge was written because he had not heeded warnings to stop filing grievances related to his security level and to his conditions of confinement in segregation.  Three days before the charge was written, Wall filed a grievance appealing the decision to keep him in segregation following a hearing before the Institutional Classification Authority (ICA), and requesting "prompt classification action" and "immediate improvement of [his] living conditions." Compl. Ex. 8(b) at 9, ECF No. 1-2.[6]

Meade denies that he took any action against Wall in retaliation for appealing a decision concerning Wall's security level. Meade also denies writing a false disciplinary charge.  Meade states that while making arounds in the C-3 pod on the morning of July 23, 2017, he discovered that Wall had his cell window and vent

---

[6]  Wall's Second Amended Complaint references numerous exhibits submitted with his original Complaint.  In full his original Complaint with exhibits constitutes 382 pages.

covered.  Meade "gave Wall several orders to clear his vent and his cell window and Wall stated, 'I'm not clearing the vent go ahead and charge me!'"  Defs.' Mem. Supp. Mot. Summ. J. Ex. 2, Meade Aff. ¶ 4, ECF No. 117-2.  On July 31, 2017, Inmate Hearings Officer Larry Mullins found Wall guilty of disobeying a direct order.

Wall asserts that "he never had his cell window or vent covered at anytime on 7/23/17" and that he would have been exonerated of the charge if Hearings Officer Mullins had not refused to review surveillance footage from the pod. Pl.'s Supp'l Resp. Opp'n Defs.' Mot. Summ. J., Wall Aff. ¶¶ 2–4, ECF No. 154. Wall also avers that, "during outside recreation on or about 7/25/17," Meade told him that his "continued [efforts] to challenge the conditions of [his] confinement by appealing these ICA hearings was the reason [Meade] wrote the fabricated charge." *Id*. ¶ 9.

In light of the parties' conflicting affidavits, I conclude that Meade is not entitled to summary judgment. *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016) ("[W]here affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie.").  The affidavits create factual disputes as to whether Meade falsely charged Wall with disobeying a direct order and as to whether Meade wrote the charge against him for filing grievances challenging his conditions of confinement.  These factual disputes must be resolved by a jury, which will have to assess the credibility of Meade, Wall, and other

witnesses.  Accordingly, the Motion for Summary Judgment will be denied with respect to the retaliation claim against Meade.[7]

ii.  Charge Written by Moore.

Wall alleges that, on January 28, 2018, Moore wrote a fabricated charge against him for engaging in lewd or obscene acts.  Earlier that month, Wall appealed the denial of a grievance challenging the decision to keep him in segregation.  A few days after Wall was found guilty of the disciplinary charge, Moore allegedly informed Wall that "she was told to write that charge to keep [him] in seg[regation] because of a grievance or lawsuit [he] filed."  2d Am. Compl. ¶ 72, ECF No. 67.

Wall correctly notes that the VDOC defendants did not address this particular claim in the memorandum filed in support of their Motion for Summary Judgment.  Consequently, the retaliation claim against Moore will also proceed to trial.

---

[7] At the conclusion of the memorandum filed in support of the Motion for Summary Judgment, the VDOC defendants summarily assert the defense of qualified immunity. When government officials are sued in their individual capacities, qualified immunity protects them "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  In April 2017, prior to the incidents giving rise to this action, the Fourth Circuit held than "an inmate's right to be free from retaliation for filing a grievance was clearly established."  *Booker II*, 855 F.3d at 552.  Accordingly, at this stage of the proceedings, Moore is not entitled to qualified immunity.  The same is true for any other defendant against whom there is sufficient evidence to survive summary judgment on a claim of retaliation for filing grievances or lawsuits.

iii.  Charge Written by Looney.

Wall alleges that, on February 7, 2018, he observed Looney inspecting several legal files or folders containing documents from a prior civil action filed against Samantha Looney (Samantha), a K-9 officer at Red Onion.  Am. Compl. ¶ 73, ECF No. 67 (citing *Wall v. Looney*, Civil Action No. 7:13CV00587 (W.D. Va.)).  Wall alleges that while Looney was examining the documents, he heard Looney say, "He sued Samantha."  *Id.*  Immediately after making that comment, Looney purportedly ripped a pair of orange pants and asserted that he had found them under Wall's bed.  Later that day, Looney charged Wall with intentionally destroying or altering state property.  Wall claims that Looney "fabricated" the disciplinary charge in retaliation for suing Samantha.  *Id.*

Looney denies that he took any action against Wall in retaliation for filing a lawsuit against Samantha.  Looney states that he knows Samantha but is not related to her.  Looney reports that he and another officer conducted a routine search of Wall's cell on February 7, 2018, during which Looney "found a pair of orange state issued pants that were ripped into strips."  Defs.' Mem. Supp. Mot. Summ. J. Ex. 5, Looney Aff. ¶ 4, ECF No. 117-5.  When Looney asked Wall about the pants, Wall allegedly admitted ripping them and said, "Go ahead and write me a charge punk."  *Id.*  Looney subsequently charged Wall with intentionally destroying state property.

On February 16, 2018, Hearings Officer Mullins found Wall guilty of the disciplinary charge.

In response, Wall states that he "at no time [had] a pair of ripped pants in [his] cell."  Wall Aff. ¶ 25, ECF No. 154.  Wall again asserts that Looney ripped the orange pants himself after reading the legal documents in the cell and discovering that Wall had sued Samantha.

Wall and Looney have thus provided contradictory accounts of what transpired in Wall's cell on February 7, 2018.  The conflicting affidavits create a factual dispute as to whether Looney falsely charged Wall with intentionally destroying state property and as to whether Looney wrote the charge against Wall for suing another officer.  While the VDOC defendants argue that it is "simply preposterous" to suggest that a correctional officer "would put his job in jeopardy by intentionally fabricating a minor disciplinary charge against an inmate to retaliate for a person to whom he is unrelated," Defs.' Mem. Supp. Mot. Summ. J. 12, ECF No. 117, that sort of credibility challenge is not a proper basis for summary judgment.  The Fourth Circuit has made clear that in deciding a motion for summary judgment, "[a] district court may not weigh the evidence or make credibility determinations, and is not in a position to disregard stories that seem hard to believe."  *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019).  Instead, a district court is required to construe the evidence in the light most favorable to the

nonmoving party, even if it does not believe that the nonmoving party ultimately will prevail at trial.  *Id*.

Viewing the evidence in the light most favorable to Wall, a reasonable jury could find that Looney falsely charged him with destroying state property after discovering that Wall had previously sued another officer at Red Onion.  Likewise, given that Looney lodged the disciplinary charge shortly after examining Wall's legal papers and commenting about the lawsuit, a reasonable jury could find that there was a causal relationship between Wall's protected activity and the adverse action.  *Shaw*, 59 F.4th at 131 (concluding that the "extremely close temporal proximity" between an inmate's protected activity and his transfer to Red Onion was sufficient to support an inference of causation); *Penley v. McDowell Cnty. Bd. of Educ*., 876 F.3d 646, 656 (4th Cir. 2017) ("In retaliation cases, a causal connection may exist where the employer takes adverse employment action against an employee shortly after learning of the protected activity.").  Therefore, I conclude that Looney is not entitled to summary judgment.

### b.  Denial of a Shower and Outside Recreation.

Wall claims that Dickenson denied him a shower and outside recreation on June 7, 2018, in retaliation for filing grievances.  Wall alleges that Dickenson falsely reported that Wall "refused" a shower and outside recreation after he "clearly made known [his] desire for both."  2d Am. Compl. ¶ 90, ECF No. 67.  Wall further alleges

that Dickenson told him that he was not going to receive recreation time that day because he "like[s] to write complaints about being retaliated against." *Id.*

I agree with the VDOC defendants that the alleged loss of shower and recreation privileges is not sufficiently adverse to support a claim of retaliation. *Stanley v. Haynes-Love*, No. 19-2095, 2020 U.S. App. LEXIS 5887, at *3–4 (6th Cir. Feb. 26, 2020) (unpublished) (concluding that the loss of shower privileges for a few days would not deter a person of ordinary firmness from engaging in First Amendment activity and therefore denying leave to appeal in forma pauperis from the dismissal of a retaliation claim); *Newmones v. Ransom*, No. 1:21-CV-00276, 2022 WL 4536296, at *5  (W.D. Pa. Sept. 29, 2022) (determining that "[t]he deprivation of cleaning supplies, showers, and recreation [for two days] are *de minimis* inconveniences and not adverse actions"); *Sears v. Mooney*, No. 1:17-cv-50, 2019 WL 6726839, at *8 (M.D. Pa. Dec. 11, 2019) (concluding that the plaintiff's "inability to shower and use the exercise yard for a week" did not rise to the level of adverse actions).  Therefore, Dickenson is entitled to summary judgment on this claim.

### c. Continued Confinement in Segregation at Security Level "S."

Wall's remaining claims of retaliation are related to his security level and to his continued confinement in segregation.  The claims are asserted against A.

Duncan, L. Collins, Lt. J. Kiser, Lt. G. Adams, R. Boyd., Lt. J. Lambert, and E. Sowards.

> i. Wall's Allegations and Exhibits.

In his Second Amended Complaint, Wall alleges that he learned through the ICA review process that officials simply "rubber-stamp[]" the initial recommendation as to whether an inmate should remain in segregation, rendering ICA reviews "meaningless" and "inadequate." Second Am. Compl. ¶ 56, ECF No. 67. When he shared his "findings" with prison officials after an ICA hearing in May 2017, Duncan, Lt. J. Kiser, and Sowards allegedly "warned" him that it would not be wise to "keep appealing every ICA decision" and assured him that he would be released from segregation following his next 90-day ICA review. *Id.* ¶ 57.

An ICA report attached to Wall's original Complaint reflects that the next 90-day housing hearing occurred in mid-July 2017. At that time, according to the report, Wall had completed the Challenge Series, one of the requirements for transitioning out of segregation. The ICA, including Lt. Kiser, recommended an "[i]nternal status change to Intensive Management 2," and the Dual Treatment Team approved Wall being "released to [the] IM Closed pod pending bed space." Compl. Ex. 8(a) at 8, ECF No. 1-2. Duncan, who was responsible for conducting an administrative review, initially approved the internal status change recommended by the ICA. Nonetheless, Duncan noted that Wall would remain in segregation at that time.

On July 20, 2017, Wall filed a grievance appealing the ICA report. He specifically challenged Duncan's "rationale of 'Remain Segregation.'" Compl. Ex. 8(b) at 9, ECF No. 1-2.

On July 25, 2017, Wall appeared before the ICA for a security level review. The ICA recommended that Wall's security level be reduced from "S" to "Level 6." Compl. Ex. 9(a) at 13, ECF No. 1-2. Lt. Kiser listed the "[r]ationale" for the recommendation as follows: "Offender has been reviewed and approved by the Dual Treatment team for release to the IM Closed pod, due to completion of The Challenge Series." *Id.*

On July 31, 2017, Duncan disapproved the ICA's recommendation that Wall's security level be reduced from "S" to "Level 6" and its recommendation that Wall be released from segregation, citing "recent institutional infractions" as the basis for her decision. *Id.* Several days earlier, defendant Meade issued the disciplinary charge for disobeying a direct order—the same charge that Wall claims was written in retaliation for challenging his continued placement in segregation.

On August 22, 2017, Wall filed a grievance appealing Duncan's decision. The grievance was deemed unfounded, and that decision was upheld on appeal.

Wall received his next 90-day housing hearing on October 4, 2017. Following the hearing, Adams, the designated ICA officer, recommended that Wall remain in segregation and Collins approved the recommendation. Both staff

members noted that Wall was not permitted to be released from segregation until he "completed six months infraction free behavior."  Compl. Ex. 10(a) at 18, ECF No. 1-2.

On October 15, 2017, Wall filed a grievance appealing the disposition of the 90-day hearing.  The grievance was deemed unfounded, and that decision was upheld on appeal.

Wall alleges that, on November 8, 2017, he learned that several prison officials, including Collins, had been served with his complaint in *Wall v. Rasnick*, No. 7:17CV00385 (W.D. Va.).  Two days later, Collins allegedly informed him that he would "never get out of the hole as long as [he keeps] filing lawsuits." 2d Am. Compl. ¶ 67, ECF No. 67.

Wall received his next 90-day housing hearing on December 13, 2017. Following that hearing, the ICA recommended that Wall remain in segregation. Collins approved the ICA's recommendation on December 18, 2017, noting that Wall had not "completed his annual case plan goal of completing the challenge series."  Compl. Ex. 11(a) at 23, ECF No. 1-2.

On December 20, 2017, Wall filed a grievance appealing the decision.  He asserted that the rationale for the decision was incorrect because he had completed the Challenge Series.  The grievance was deemed unfounded, and that decision was upheld on appeal.

Wall was required to remain in segregation following 90-day housing hearings in March 2018 and June 2018. Lambert was the designated ICA officer for the March hearing, and Boyd was the designated ICA officer for the June hearing. Following both hearings, the ICA recommended that Wall remain in segregation. Collins approved the recommendations on both occasions. The rationale provided on each occasion was that Wall had refused to participate in the Step Down Program.

ii. The Parties' Arguments.

The VDOC defendants argue that Duncan, Lt. Kiser, Sowards, Adams, Boyd, Lambert, and Collins are all entitled to summary judgment. They contend that "[a] warning not to appeal is not an adverse action taken by [Duncan, Lt. Kiser, and Sowards]" and that "there is no causal relationship between a 'warning' and any conduct by these Defendants." Defs.' Mem. Supp. Mot. Summ. J. 16, ECF No. 117. The VDOC defendants similarly argue that the statement attributed to Collins "is not enough to state a claim of retaliation in that there is no action taken by Defendant Collins that adversely affects [Wall's] ability to file lawsuits and grievances." *Id.* at 17. The VDOC defendants further argue that Wall failed to advance out of segregation as a result of "his own poor actions." *Id.*

In an affidavit filed in support of the Motion for Summary Judgment, Duncan denies that she told Wall to refrain from appealing ICA decisions or that she took any action against Wall in retaliation for exercising his right to appeal such

decisions.  Likewise, Collins denies that he made the statement attributed to him or that he retaliated against Wall for any reason.  Collins further avers that he only has "input on an offender's classification and housing assignment" and that he is "not solely responsible for such decisions."  Defs.' Mem. Supp. Summ. J. Ex. 1, Collins Aff. ¶ 7, ECF No. 117-1.

In response to the Motion for Summary Judgment, Wall focuses primarily on the retaliation claims asserted against Duncan and Collins.  Wall contends that Duncan warned him not to continue appealing decisions and that she then "took an 'adverse action' (after he wrote the 7/20/17 Grievance) by denying [him] release from Security Level-'S,' Segregation Confinement on 7/31/17," despite the decision by the Dual Treatment Team.  Pl.'s Supp'l Resp. Opp'n Defs.' Mot. Summ. J. 2, ECF No. 154.  Wall likewise argues that Collins took adverse actions against him by approving the ICA's recommendations that he remain in segregation and that one of the recommendations was approved in December 2017, shortly after Collins allegedly warned him that he would never leave segregation if he continued to file lawsuits.  Wall also argues that Collins provided a "fabricated rationale" to support Wall's continued confinement in segregation—namely, that Wall had not completed the *Challenge Series*.  *Id.*

iii.  Analysis.

Viewing the record in the light most favorable to Wall, I conclude that genuine issues of material fact preclude the entry of summary judgment in favor of Duncan and Collins, both of whom were responsible for approving or disapproving the ICA's recommendations.  The VDOC defendants correctly note that a verbal warning or vague threat, standing alone, does not rise to the level of an adverse action.  *Hayes v. Dahlke*, 976 F.3d 259, 274 (2d Cir. 2020) (concluding that a defendant's comment that "maybe all of this would go away" if an inmate stopped filing grievances, combined with a one-month delay in filing a grievance, did not rise to the level of an adverse action).  On the other hand, threats accompanied by an action such as placing an inmate in restrictive housing "surely constitute adverse action."  *Id.*

Here, Wall's claims against Duncan and Collins are not based solely on their alleged comments.  Instead, Wall has presented evidence indicating that Duncan disapproved the recommendation that he be released from segregation and that Collins played a role in his continued placement in segregation in the months following Duncan's decision.[8]  Drawing all reasonable inferences in favor of Wall,

---

[8] Collins's assertion that he is not solely responsible for the decision to keep an inmate in segregation is not dispositive of the retaliation claim against him.  There is clearly enough evidence from which a reasonable jury could find that he was personally involved in the decision.  *Granger v. Santiago*, No. 3:19-CV-60 (MPS), 2021 WL 4133752, at *7 (D. Conn. Sept. 10, 2021) (denying a defendant's motion for summary judgment based on the conclusion that a reasonable jury could find that the defendant "played a role" in an

a reasonable jury could find that the actions taken by Duncan and Collins were sufficiently adverse to support a claim of retaliation.  *Martin I*, 858 F.3d at 250 (recognizing that placing an inmate in segregation could deter a person of ordinary firmness from exercising his First Amendment rights).

Wall has also presented sufficient evidence of a causal connection between his protected conduct and the adverse actions taken by Duncan and Collins. According to Wall's evidence, Duncan warned him not to continue appealing ICA decisions, and she disapproved the recommendation that he be released from segregation within days of Wall filing a grievance challenging one of her decisions. Similarly, Wall has presented evidence indicating that Collins, who was named as a defendant in another lawsuit, approved a recommendation for Wall to continue being housed in segregation after telling Wall that he would never be released from segregation if he continued filing lawsuits.  Wall has also presented evidence suggesting that the reasons provided for decisions made by Duncan and Collins were false or incorrect.  Viewing the evidence in the light most favorable to Wall, I conclude that a reasonable jury could find that the adverse decisions made by Duncan and Collins were motivated by an impermissible desire to retaliate against Wall for engaging in protected conduct and that these defendants would not have

---

inmate's transfer and that the decision to transfer the inmate was motivated by an impermissible desire to retaliate against the inmate for engaging in protected conduct).

made the same decisions in the absence of Wall's protected activity.  Accordingly, the Motion for Summary Judgment will be denied with respect to the retaliation claims against Duncan and Collins.

On the other hand, I conclude that summary judgment is appropriate with respect to the claims against Sowards, Lt. Kiser, Adams, Boyd, and Lambert. Although Wall alleges that Sowards and Lt. Kiser also warned him against appealing ICA decisions, Wall does not cite to any evidence indicating that either of these defendants took any adverse action against him after offering those warnings.  There is no evidence that Sowards had any involvement in the adverse ICA decisions, and the record reflects that Lt. Kiser recommended that Wall be released from segregation.  As indicated above, the verbal warnings allegedly made by these defendants, standing alone, do not constitute the type of adverse action required to prevail on a claim of retaliation.  Accordingly, I conclude that Sowards and Lt. Kiser are entitled to summary judgment.

The record reflects that Adams, Boyd, and Lambert served as the designated ICA officer for some of Wall's 90-day reviews and that they recommended against releasing Wall from segregation.  Unlike Duncan and Collins, however, Wall has not presented evidence from which a reasonable jury could find that the adverse recommendations from Adams, Boyd, and Lambert were causally connected to Wall's protected activity.  With respect to these three defendants, there is insufficient

evidence from which a reasonable jury could find that they had knowledge of Wall's grievances or his lawsuits against other prison employees.  While Wall may believe that any adverse recommendation regarding his housing status was motivated by his protected activity, "[h]is personal belief that he was the victim of retaliation is not sufficient to support a retaliation claim."  *Davis v. Young*, 624 F. App'x 203, 206 (5th Cir. 2015) (unpublished). For these reasons, I conclude that Adams, Boyd, and Lambert are entitled to summary judgment.

### 3. Eighth Amendment Claims of Excessive Force and Failure to Intervene.

Wall next asserts claims of excessive force and failure to intervene in violation of the Eighth Amendment's prohibition of cruel and unusual punishment.  The claim of excessive force is asserted against Dickenson, Mullins, and Begley, and the claim of failure to intervene is asserted against Collins and Gilbert.

### a.  Wall's Sworn Allegations.

Wall alleges that he was subjected to excessive force on June 7, 2018, when he was moved to another cell after staging a "confrontation" in cell C-114 in response to being denied a shower and recreation time by Dickenson.  Second Am. Compl. ¶¶ 90–91, ECF No. 67.  Wall alleges that he "willingly" came out of his original cell following the use of pepper spray and "compliantly walked to Charlie-300 pod," where he was placed in cell C-301.  *Id.* ¶ 91.  He asserts that after the cell door closed, while he was still handcuffed, his "arms were yanked through the tray

slot by a strap attached to the handcuffs." *Id.* He alleges that he suffered injuries to both wrists before the handcuffs were removed and that Dickenson attempted to cover up the use of force by falsely claiming that Wall was being resistant during the process of removing the handcuffs.

Wall seeks to hold Dickenson, Mullins, and Begley liable for the use of excessive force. He claims that these three defendants used force "maliciously and sadistically for the very purpose of causing pain" and "without need or provocation." *Id.* ¶ 116. Wall further asserts that Collins and Gilbert "witnessed the assault and failed to intervene to prevent the misuse of force." *Id.*

### b. VDOC Defendants' Evidence.

The VDOC defendants dispute the truth of Wall's allegations. In an affidavit filed in support of the Motion for Summary Judgment, Begley asserts that the incident described by Wall "did not happen" and that none of the officers pulled his arms through the tray slot. Defs.' Mem. Supp. Mot. Summ. J. Ex. 3, Begley Aff. ¶ 5, ECF No. 117-3. Likewise, Collins asserts that he did not see the alleged incident happen and that he has "no knowledge or reason to believe that Dickenson, Mullins and Begley pulled Walls' arms through the tray slot." Collins Aff. ¶ 5, ECF No. 117-1. Although Dickenson does "not recall an incident with Wall," he notes that an incident report that he prepared on June 7, 2018, "indicates that after [Wall's] restraints were removed, [Wall] proceeded to beat his hands on the cell door

window." Defs.' Reply Supp. Mot. Summ. J. Ex. 1, Dickenson Aff. ¶ 12, ECF No. 159-1. The VDOC defendants also argue that Wall's allegations are contradicted by available video footage.

On August 2, 2022, the VDOC defendants submitted surveillance footage of Wall being moved to cell C-301 on June 7, 2018. They also submitted a video recording of Wall being placed in cell C-301 and a video recording of Wall being examined by a nurse. I have carefully reviewed each of the video files submitted by the VDOC defendants.

The first file, beginning with the number 180607083901, contains video footage from a surveillance camera located across from cell C-301. The recorded footage is approximately twenty-eight minutes long and has no audio. It shows Wall being placed in cell C-301. At the 10:36 mark,[9] the cell door closes. Three officers can be seen huddled around the cell door while five other staff members are standing nearby. Given the distance between the camera and the cell, however, the surveillance footage does not provide a clear view of the officers' interactions with Wall at the cell door.

A second file, labeled M2U00530, contains video and audio footage from what appears to be a handheld camera. The video is approximately 45 minutes long,

_____

[9] I will refer to the elapsed time at the bottom of the videos when describing specific portions of the video footage.

and the recording begins while Wall is still confined in cell C-114.  At the 27:20

mark, an extraction team arrives to assist in removing Wall from the cell.  Wall

eventually complies with the officers' orders.  The cell door opens at approximately

the 31:40 mark, and officers remove Wall from the cell. The video then shows Wall

being moved to the housing unit in which cell C-301 is located.  Wall's hands are

cuffed behind his back, and he is wearing leg shackles.  At the 34:16 mark, a nurse

speaks to Wall outside cell C-301, and he complains of the handcuffs and leg

shackles being too tight.  Officers then begin the process of placing Wall in cell C-

301.  Wall remains restrained in a kneeling position for several minutes while being

closely surrounded by three officers, two of whom maintain control of his arms.  At

approximately the 41:09 mark, the third officer, who is positioned between the other

two officers, begins removing Wall's pants, followed by his leg shackles. During

that process, Wall remains in handcuffs attached to a strap held by one of the other

officers.  At approximately the 43:23 mark, the officer on the far left removes the

slack in the strap by pulling on it.  A few seconds later, at the 43:30 mark, the cell

door closes as that officer maintains control of the strap, and the door can be heard

locking.  One of the officers then instructs Wall to put his hands through the tray

slot. At that point, the same three officers are standing immediately outside the cell

door, and the officer responsible for removing Wall's leg shackles, who later

identifies himself as Sgt. Dickenson, is standing directly in front of the tray slot. At

approximately the 43:44 mark, the officer on the far left, who had been holding the strap attached to the handcuffs, can be seen moving his right arm and elbow back, just as Wall can be heard saying, "Stop pulling my arm, man." One of the officers subsequently tells Wall that he will not be able to remove the handcuffs if Wall continues to resist. By the 44:02 mark, the handcuffs are fully removed. During the remaining minute of the video, Wall can be seen looking out the window of his cell door. He does not appear to be beating his hands on the window.

Based on the camera's placement and the positions of the officers in relation to the tray slot, the recording does not provide an unobstructed view of the officers' actions. Likewise, because Dickenson is standing directly in front of tray slot while the handcuffs are being removed, Wall's arms and hands cannot be seen in the recording.

A third file, labeled M2U00532, also contains video and audio footage from a handheld camera. The recording is approximately six minutes long. It shows Wall being examined by a nurse after being moved to cell C-301. At approximately the 1:34 mark, Wall can be heard complaining about his wrists. He then asserts that the handcuffs had cut his wrists. When the nurse suggests that the injuries were caused by Wall "pulling," Wall asserts that they resulted from what occurred "in the tray slot." At the 2:08 mark, the nurse advises Wall that she will bring him antibiotic ointment. The nurse then checks Wall's vital signs. After doing so, the nurse tells

Wall that she will return with antibiotic ointment and Band-aids.  The officers then place Wall back in the cell.

### c.  Summary of Applicable Law.

An Eighth Amendment claim of excessive force involves both an objective and a subjective component.  *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019).  "The objective component measures the nature of the force employed, asking whether that force 'was sufficiently serious to establish a cause of action.'"  *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021).  "This is not a high bar; de minimis or trivial force is not enough, but anything more will suffice."  *Id.*  The Supreme Court has made clear that it is the nature of the force used, rather than the extent of the injury sustained, that "ultimately counts."  *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).  "So long as the force used is more than de minimis, the objective component is satisfied, regardless of the extent of the injury."  *Dean*, 984 F.3d at 303 (citing *Wilkins*, 559 U.S. at 39).

The subjective component requires a plaintiff to establish that a correctional officer "acted with a sufficiently culpable state of mind."  *Brooks*, 924 F.3d at 112.  "In contrast to the objective component, this is a demanding standard; the state of mind required . . . is wantonness in the infliction of pain."  *Id.*  "Whether an inmate can establish that impermissible motive turns on 'whether force was applied in a

good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Dean*, 984 F.3d at 302.

The subjective component may be established through direct or circumstantial evidence. *Id.* at 308–09. In assessing whether an officer acted with a sufficiently culpable state of mind, I must consider four non-exclusive factors : "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008).

An officer who does not personally use excessive force against an inmate may nonetheless be subject to liability under § 1983 if he fails to prevent other officers from violating the inmate's constitutional rights.

> The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them. Therefore, if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and [be] treated accordingly.

*Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir. 2002).

### d. Analysis.

After reviewing the parties' sworn statements and the available video footage, I conclude that genuine issues of material fact preclude summary judgment on the claim of excessive force against Dickenson, Mullins, and Begley. Having reviewed

the available video footage, I cannot find that it so clearly contradicts Wall's account of the use of force that I am entitled to reject it at this stage of the proceedings. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (holding that a court should not adopt a plaintiff's version of the facts when ruling on a motion for summary judgment if a video "quite clearly contradicts [that] version"). As indicated above, the officer positioned farthest to the left, who had been controlling the strap attached to Wall's handcuffs, can be seen moving his right arm and elbow back just as Wall yells to stop pulling his arm. As the officers proceed to remove the handcuffs through the tray slot, their arm and hand movements are not fully visible in the footage from the video camera, based on how closely they are standing to the cell door. Although one of the officers can be heard telling Wall to stop resisting, Wall's arms and hands cannot be seen in the video footage since Dickenson is blocking the camera's view of the tray slot. Additionally, after examining Wall's wrists, the nurse advises Wall that she will bring him antibiotic ointment and Band-aids, and Wall informs the nurse that his wrists had been cut in the tray slot. Thus, the video evidence does not clearly contradict Wall's allegations regarding the use of force. Nor does it support a finding that any injuries were self-inflicted after the handcuffs were removed.

Viewing the record in the light most favorable to Wall, I find that genuine issues of material fact exist as to whether Dickenson, Mullins, and/or Begley used "more than de minimis force" in removing Wall's handcuffs, and as to whether force

"was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Dean*, 984 F.3d at 302–03. According to Wall's account of the incident, the officers forcefully pulled on his arms, causing injuries to his wrists, even though he complied with the officers' orders upon entering the cell and did not resist their efforts to remove his handcuffs. Given that Wall's cell door was locked at the time his handcuffs were removed through the tray slot, a reasonably jury could find that Wall did not pose a threat to the officers' safety at that particular time. Moreover, the nurse's statements recorded by the video camera following the incident indicate that Wall had abrasions or lacerations on his wrists. Even if the abrasions or lacerations were relatively minor, the extent of Wall's visible injuries does not conclusively refute his claim that the officers used excessive force against him. Accordingly, Dickenson, Mullins, and Begley are not entitled to summary judgment on the claim of excessive force.[10]

On the other hand, to the extent Wall seeks to hold Collins and Gilbert liable for the use of excessive force based on a theory of bystander liability, I conclude that

---

[10]   The existence of factual disputes regarding the degree of force used and the motivation for the use of force also preclude the application of qualified immunity at this stage of the proceedings. If the named defendants violated Wall's rights under the Eighth Amendment, then they "did so because [they] used force in subjective bad faith, maliciously and sadistically to cause harm." *Brooks*, 924 F.3d at 118. Because Fourth Circuit case law clearly establishes that "the bad faith and malicious use of force violates the Eighth Amendment rights of prison inmates, a corrections officer who acts with that culpable state of mind reasonably should know that [he] is violating the law." *Id.* at 118–19.

summary judgment is appropriate.  Even if both Collins and Gilbert were among the group of officers standing nearby when the use of force occurred, no reasonable jury could find from the evidence presented that these officers had a reasonable opportunity to intervene.  *Randall*, 302 F.3d at 204.  In the surveillance footage, the other officers appear to be standing several feet away from Dickenson, Mullins, and Begley, while those three officers remove or assist in removing Wall's handcuffs.  The handcuffs were completely removed approximately one minute after Wall's cell door closed.  During the process of removing the handcuffs, Dickenson, Mullins, and Begley were huddled around the tray slot and Dickenson was positioned directly in front of it, effectively blocking the views of the other officers standing nearby.  Thus, the video evidence supports Collins's sworn statement denying that he saw Wall's arms being pulled by the other officers.  Moreover, even if Collins or Gilbert caught a glimpse of Wall's arms being pulled, the evidence is insufficient to create a genuine dispute of fact as to whether they had a reasonable opportunity to prevent such actions from occurring.  Accordingly, Collins and Gilbert are entitled to summary judgment on the claim that they failed to intervene in the use of excessive force by Dickenson, Mullins, and Begley.

### 4. Segregation-Related Claims under the Eighth and Fourteenth Amendments.

Wall's remaining claims under § 1983 relate to his long-term placement in segregation at Red Onion.  Wall claims that he was held in segregation without

receiving due process in violation of the Fourteenth Amendment and that his conditions of confinement violated his Eighth Amendment right to be free from cruel and unusual punishment.  The due process claim remains pending against thirteen defendants, including Jeffrey Kiser.  The Eighth Amendment claim remains pending against six defendants, including Jeffrey Kiser, Harold Clarke, and Marcus Elam.

The VDOC defendants did not move for summary judgment on these claims based on the assertion that the same claims are being litigated in *Thorpe v. Virginia Department of Corrections*, No. 2:20CV00007 (W.D. Va.), a putative class action in which Wall is one of twelve named plaintiffs.  The VDOC defendants have previously argued that Wall's due process and Eighth Amendment claims related to his long-term confinement in segregation are at least partially duplicative of the due process and Eighth Amendment claims asserted in *Thorpe*.  Defs.' Resp. to Order, ECF No. 104.

The *Thorpe* plaintiffs filed suit in the United States District Court for the Eastern District of Virginia on May 6, 2019.  The action was transferred to this district on April 21, 2020.  In their complaint, the *Thorpe* plaintiffs seek "declarative and injunctive relief as well as damages against VDOC and several corrections officers who created and administered their segregation program." *Thorpe v. Clarke*, 37 F.4th 926, 931 (4th Cir. 2022) (affirming the denial of a motion to dismiss on the grounds of qualified immunity).  They claim that the named defendants, including

Harold Clarke, Jeffrey Kiser, and Marcus Elam, violated "their Eighth Amendment right to be free from cruel and unusual punishment and their Fourteenth Amendment right to receive sufficient process." *Id.* at 930. They allege, as Wall does here, that the defendants subjected them to unconstitutionally cruel conditions of confinement and that the defendants failed to afford minimally adequate process to protect their liberty interest in avoiding long-term confinement in segregation.

A district court may dismiss a claim filed in forma pauperis "at any time" if it determines that the claim is "frivolous or malicious." 28 U.S.C. § 1915(e)(2); *see also* 28 U.S.C. § 1915A(b)(1). "Because district courts are not required to entertain duplicative or redundant lawsuits, they may dismiss them as frivolous or malicious pursuant to § 1915(e)." *McClary v. Lightsey*, 673 F. App'x 357, 357 (4th Cir. 2017) (unpublished) (citing *Aziz v. Burrows*, 976 F.2d 1158, 1158 (8th Cir. 1992)). "Generally, lawsuits are duplicative if the parties, issues, and available relief are not different from each other." *Id.*

One form of duplicative litigation involves what is referred to as "claim splitting." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 F. App'x 256, 265 (4th Cir. 2008) (unpublished). "The rule against claim splitting prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action." *Id.* Pursuant to this rule, a second claim will be barred "if the claim involves the same parties and arises out of the same

transaction or series of transactions as the first claim." *Id.* "When one suit is pending in federal court, a plaintiff has no right to assert another action on the same subject in the same court, against the same defendant at the same time." *Id.*

Applying these principles, I conclude that the due process claim against Jeffrey Kiser is subject to dismissal as duplicative, as are the Eighth Amendment claims against Jeffrey Kiser, Clarke, and Elam. All three correctional officials are named as defendants in *Thorpe*, and the claims against them in *Thorpe* mirror those asserted in this case. Wall alleges that state inmates have a liberty interest in avoiding long-term confinement in segregation and that he was deprived of that interest without receiving adequate procedural protections, including "meaningful periodic reviews." 2d Am. Compl. ¶ 115, ECF No. 67. Wall further alleges that his conditions of confinement in segregation posed a substantial risk of serious psychological and emotional harm; that Jeffrey Kiser, Clarke, Elam, and other correctional officials had knowledge of the risk posed by the conditions of confinement; and that they acted with deliberate indifference to that risk. *Id.* ¶ 33. Thus, Wall's claims against Jeffrey Kiser, Clarke, and Elam are duplicative of the claims asserted in *Thorpe*. They plainly involve the "same subject," and they are being pursued "in the same court, against the same defendant at the same time."

*Sensormatic Sec. Corp.*, 273 F. App'x at 265.  Accordingly, the claims against

Jeffrey Kiser, Clarke, and Elam will be dismissed without prejudice as duplicative.[11]

At this stage of the proceedings, the same result cannot be reached with

respect to Wall's segregation-related Eighth and Fourteenth Amendment claims

against other VDOC defendants named in the Second Amended Complaint.  The

other VDOC defendants are not named as defendants in *Thorpe*.  Nor is there any

suggestion that they are in privity with the *Thorpe* defendants.  *Sensormatic Sec.*

*Corp. v. Sensormatic Elecs. Corp.*, 452 F. Supp. 2d 621, 626 (D. Md. 2006), *aff'd in*

*relevant part*, 273 F. App'x at 264–66 ("In a claim splitting case, the second suit will

be barred if the claim involves the same parties and arises out of the same transaction

or series of transactions as the first claim.").  Courts have held that "[g]overnment

employees in their *individual* capacities are not in privity with their government

employer" or other government employees sued in their individual capacities.

*Willner v. Budig*, 848 F.2d 1032, 1034 n.2 (10th Cir. 1988); *Jackson v. Angus*, 686

F. App'x 367, 371 (7th Cir. 2017) (unpublished) (holding that the rule against claim

---

[11]  Although the instant action was commenced first, the operative pleading containing duplicative claims — Wall's Second Amended Complaint — was executed nearly a year *after* counsel filed the *Thorpe* complaint on behalf of Wall and other inmates. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000) (noting that the "crucial date" for claim preclusion purposes is the "date the complaint was filed"); *Fawzy v. Wauquiez Boats SNC*, 873 F.3d 451, 454 (4th Cir. 2017) ("Because a properly filed amended complaint supersedes the original one and becomes the operative complaint in the case, it renders the original complaint of no effect.").  As the operative pleading, the Second Amended Complaint is subject to frivolity review under § 1915(e)(2) and § 1915A(b)(1).

splitting did not preclude a separate § 1983 action filed against different defendants in their individual capacities, and emphasizing that "it does not make a difference that the Department of Corrections employs many of the defendants — old and new — or that they might be covered by the State Employee Indemnification Act, and be represented by the same state agency"); *Riggleman v. Clarke*, No. 7:22-cv-00018, 2023 WL 2505490, at *9 (W.D. Va. Mar. 14, 2023) (concluding that the rule against claim splitting did not prohibit a pro se plaintiff from separately suing a prison doctor for inadequate medical treatment who was not named as a defendant in a related action filed by counsel, since the doctor was not in privity with the defendants named in the other action). Accordingly, at this stage of the proceedings, I decline to dismiss the segregation-related Eighth and Fourteenth Amendment claims asserted against defendants who are not parties to the *Thorpe* litigation.

The arguments advanced by the VDOC defendants nonetheless appear to weigh in favor of severing those claims into a separate action, potentially staying further proceedings on those particular claims pending the outcome of *Thorpe*, and proceeding with a jury trial on the other remaining claims. Even if claims are properly joined, a district court retains the discretion to sever claims. *Tinsley v. Streich*, 143 F. Supp. 3d 450, 462 (W.D. Va. 2015); Fed. R. Civ. P. 21, 42(b). A district court also has the authority to stay litigation pending the outcome of related proceedings. *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir.

1979) ("A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule applies whether the separate proceedings are judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court.").

At this point, neither side has specifically requested that I sever any of the remaining claims or stay further proceedings pending the resolution of the *Thorpe* litigation. Accordingly, I will direct the parties to submit briefs setting forth their respective positions on these issues within thirty days.

## C.  Claims under State Law.

Wall asserts supplemental state law claims of assault and battery against Dickenson, Mullins, and Begley, based on the alleged use of excessive force on June 8, 2018. Wall alleges that the defendants committed assault and battery by "yanking [his] arms through a metal tray slot . . . without need or provocation," causing injuries to his wrists and forearms. 2d Am. Compl. ¶ 119, ECF No. 67.

In moving for summary judgment on these claims, the VDOC defendants argue that the claims fail because the named officers "did not pull [Wall's] arms through the tray slot." Defs.' Mem. Supp. Mot. Summ. J. 21, ECF No. 117. Because

a genuine issue of material fact exists with respect to this issue, the Motion for Summary Judgment will be denied as to the claims of assault and battery.

CONCLUSION.

In accordance with the foregoing, it is **ORDERED** as follows:

1. The VDOC defendants' Motion for Summary Judgment, ECF No. 116, is GRANTED IN PART AND DENIED IN PART; the motion is GRANTED as to the First Amendment retaliation claims against Dickenson, Lt. J. Kiser, Adams, Boyd, Lambert, and Sowards, and the Eighth Amendment failure-to-intervene claim against Collins and Gilbert; and the motion is DENIED as to the First Amendment retaliation claims against Meade, Moore, Looney, Duncan, and Collins, and the Eighth Amendment and state law claims of excessive force, assault, and battery against Dickenson, Mullins, and Begley.

2. Wall's segregation-related Eighth and Fourteenth Amendment claims against Jeffrey Kiser, Clarke, and Elam are summarily dismissed as duplicative of the claims asserted against the same defendants in *Thorpe*.

3. Within thirty days, the parties must file briefs setting forth their respective positions on whether the segregation-related Eighth and Fourteenth Amendment claims against other remaining defendants should be severed into a separate action and, if so, whether further proceedings on such claims should be stayed pending the outcome of *Thorpe*.

ENTER:   March 29, 2023

/s/  JAMES P. JONES
Senior United States District Judge